R.M.W. *v.* STATE of Arkansas

CR 08-505                                                     289 S.W.3d 46

Supreme Court of Arkansas
Opinion delivered November 6, 2008

*Julia B. Jackson*, Public Defender Conflicts Office, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *LeaAnn J. Irvin*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Chief Justice. R.M.W. appeals an order of the Pulaski County Circuit Court, Criminal Division, deny-

ing his motion to transfer his case to the circuit court, juvenile division, pursuant to Arkansas Code Annotated § 9-27-318 (Supp. 2005). He argues that the circuit court's decision to try him as an adult is clearly erroneous in that the decision is not supported by clear and convincing evidence. We hold that the trial court was not clearly erroneous and that the decision is supported by clear and convincing evidence. Our jurisdiction is pursuant to Arkansas Supreme Court Rule 1-2(b)(4).

*Facts*

On July 17, 2007, Tom & Jean's Grocery was robbed. Store owner Ghazi Hammad suffered multiple gunshot wounds and later died. His wife Khadijah Awwad suffered a gunshot wound and survived. R.M.W. and M. B. were charged as adults with capital murder, attempted capital murder, and aggravated robbery. At the time of the robbery, R.M.W. was fifteen years old, and M.B. was seventeen years old.

R.M.W. moved to transfer the criminal action against him to the juvenile division. At the hearing on the motion, evidence was presented to show that while he was fifteen, he functioned at the level of a twelve- to thirteen-year-old. Family, teachers, and a psychologist testified that R.M.W. was childlike and immature. They noted that he prefers the company of children who are younger than he is because he enjoys their interests. Evidence was presented to show that R.M.W. still plays cars with younger boys and that he plays juvenile games that others his age long ago abandoned. Evidence was also presented to show that R.M.W. had never been violent or showed any tendencies toward aggressiveness or violence. There was additional evidence that R.M.W. was always respectful and mannerly in his dealings with teachers and others and that he was helpful and kind. A deputy sheriff who works with R.M.W. in detention testified that he is very obedient and respectful, and does not seem to understand why he is being held. She further noted that he is easily intimidated by the other inmates. Several witnesses testified that R.M.W. is a follower. They stated further that he does not plan in life, and that he acts impulsively without foreseeing consequences.

R.M.W.'s account of what happened was introduced through his testimony and the testimony of his mother. R.M.W. was permitted to return to his old neighborhood and stay overnight on July 17 with his friend M.B. M.B. asked R.M.W. if he wanted to go buy candy, and R.M.W. agreed. On the way to the

store, M.B. stated, "I'm tired of this shit." R.M.W. asked, "Tired of what?" M.B. responded, "I'm tired of being broke. I am fixing to rob a store. Are you down?" R.M.W. testified that he told M.B. "No." R.M.W. states that at this point, M.B. pulled out a gun and put it to R.M.W.'s head saying if he "didn't do it, he was going to kill me." R.M.W. further stated:

> He told me to go in there and act like I was getting some candy and stuff like that. . . . I went in the store and acted like I was getting some candy. I was walking around. And I didn't know what to do. I was just walking around. I went on the other side of the rack, and he came behind me and said if I didn't do it he was going to kill me.

R.M.W. stated that he then pulled out his gun and pointed it at Hammad and Awwad, telling them to raise their hands. R.M.W. further stated that he kept his gun on Hammad and Awwad for a while, and in trying to get out of the robbery, he handed his gun to M.B., who took it, but handed it back to R.M.W. requiring him to go on. Hammad then began to walk toward him and M.B., and R.M.W. stated that he dropped his pistol because he did not want to go through with the robbery. Hammad attacked them, and M.B. shot Hammad. They escaped to the woods, and when M.B. fell asleep, R.M.W. fled. He called his mother the next morning and turned himself into the police.

M.B. testified that he and R.M.W. planned the robbery together. He also testified that R.M.W. wanted to be armed so they stole a pistol for R.M.W. to use in the robbery. M.B. testified that R.M.W. was a willing participant in the robbery.

A video surveillance tape in the store recorded the robbery. The video quality is sufficient to easily identify the people and see the events. There is audio, but the quality is low. The gunshots can be heard, and voices can be heard, but the voices cannot be understood. The robbery occurred shortly after 10:00 p.m. after the store had been closed for the day. The videotape shows Hammad step out of view where he apparently unlocks the door to let R.M.W. enter the store. R.M.W. goes to an aisle of merchandise to look around and Hammad leans on a nearby rack while he talks with him. M.B. did not enter with R.M.W. After speaking with R.M.W. for a few moments, Hammad returns to the front of the store and M.B. enters. M.B. walks around one aisle to encounter R.M.W. from behind in what appears to be an attempt

to conceal communication with R.M.W. M.B. walks close to R.M.W. and does appear to communicate with R.M.W. in some way. They then proceed together toward Hammad and Awwad who are near the door.

They approach Hammad and Awwad with drawn pistols. R.M.W. has a black pistol, and M.B. has a silver pistol. R.M.W. confronts Hammad with his pistol. There is physical contact between the two, and Hammad brushes R.M.W. aside. R.M.W. backs off while still holding his pistol on Hammad. Gunshots are heard and Hammad touches his mouth, apparently indicating an injury. M.B. is not visible at this point. M.B. steps out in front of Hammad holding a silver pistol on Hammad. R.M.W. is off to the right and in one camera view can be seen holding his gun on Hammad. R.M.W. then hands his pistol to M.B. Nothing on the tapes makes clear why this transfer of the gun occurred; however, the gun is soon handed back to R.M.W. R.M.W. is then seen again holding his pistol on Hammad and Awwad. M.B. makes two trips behind the counter. Hammad then approaches R.M.W. and M.B. They both back away. A scuffle between the three occurs, and R.M.W.'s black pistol falls to the floor. R.M.W. escapes and moves out of the scene toward the front of the store. A few moments later, he returns to the fight in an apparent attempt to free M.B. from Hammad by striking Hammad at least twice. As R.M.W. strikes Hammad, he is drawn back into the fray. M.B. escapes the fight and grabs the black pistol off the floor. Awwad comes to Hammad's aid and holds R.M.W. down. Hammad leaves to pursue M.B. M.B. shoots multiple times and returns to free R.M.W. from Awwad. R.M.W. moves toward the front of the store where he remains while M.B. threatens Awwad. The boys then leave the store.

At some point during the robbery, Awwad suffers a gunshot wound to the hip; however, the videotape does not reveal when that occurred. Awwad was unable to say when she was injured. The parties agreed that all shots were fired by M.B.

*Motion to Transfer to Juvenile Division*

R.M.W. moved under Arkansas Code Annotated § 9-27-318(e) to transfer his case to the juvenile division. He argued that he was intimidated and manipulated into participating in the robbery. In deciding the motion, the circuit court is to consider the following factors:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court;

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

(10) Any other factors deemed relevant by the judge.

Ark. Code Ann. § 9-27-318(g). R.M.W. appeals from the denial of a motion to transfer his case to juvenile court. *See Otis v. State*, 355 Ark. 590, 142 S.W.3d 615 (2004); *Walker v. State*, 304 Ark. 393, 803 S.W.2d 502 (1991). Section 9-27-318(e) permits any party to move to transfer, and an order on a motion to transfer may be appealed by any party. *See* Ark. Code Ann. § 9-27-318(*l*).

On August 29, 2007, the State filed criminal charges against R.M.W. in the criminal division of the circuit court. Pursuant to Arkansas Code Annotated § 9-27-318(c)(2), the State could charge R.M.W. in either the criminal division of the circuit court or the juvenile division of the circuit court because at the time of the crime R.M.W. was fifteen and charged with capital murder and aggravated robbery. Upon a finding by clear and convincing evidence that a case should be transferred to another division of the circuit court, the circuit court may do so. *See* Ark. Code Ann. § 9-27-318(h)(2); *Otis, supra.*

Clear and convincing evidence is that degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established. *Otis, supra.* This court will not reverse the circuit court's decision unless it was clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *See Flores v. State,* 350 Ark. 198, 85 S.W.3d 896 (2002).

The critical question in this case was whether, as R.M.W. alleged, he was forced or manipulated into participating in the robbery, or whether he willingly participated. The circuit court found that R.M.W. "has not matured, given his age." The circuit court also went on to find, as R.M.W.'s expert psychologist Dr. Nicholaus Paul testified, that it is unlikely a person would behave as an innocent child for fifteen years and then commit such a robbery at gunpoint. However, in weighing all the evidence, the circuit court concluded that R.M.W. was lying about the nature of his involvement in the robbery, and that regardless of his background, he was a willing participant in the robbery.

The circuit court found that several facts in this case and several events shown on the videotape contradicted R.M.W.'s story. We agree. R.M.W. entered the store first, while M.B. remained outside. That is inconsistent with a desire to avoid participating. Once inside, R.M.W. had an opportunity to warn Hammad and Awwad and provide for his safety had he wished to do so. He did not do so.

Further, R.M.W. walked in calmly and looked at goods on the shelves. Nothing on the videotape shows that R.M.W. was nervous or cowering in the moments before M.B. entered the store. Rather, he seems to be waiting for M.B.

Additionally, R.M.W. was the first to confront Hammad, and he did so by pointing a pistol at him. In this first confrontation, R.M.W. came in physical contact with Hammad. That is not consistent with a desire to withdraw or not participate. After M.B. shot Hammad in the face, R.M.W. continued to hold his pistol on Hammad.

Soon afterward, R.M.W. handed his pistol to M.B., however, why that was done is not revealed by the videotape. It is only a few more moments until R.M.W. is again pointing his pistol at both Hammad and Awwad. Shortly after this, we see Hammad approach R.M.W. and M.B. They back away. Hammad presses forward and a fight ensues. As this fight begins, R.M.W.'s black pistol falls to the floor. R.M.W. states that he threw down the pistol because he wished to stop participating in the robbery; however, the videotape shows that he dropped it during the fight. Hammad then pursued and grabbed M.B. R.M.W., who by this point is several feet away, returns to strike Hammad at least twice in an attempt to free M.B. from Hammad's attack. Coming to the robber's assistance hardly serves as evidence R.M.W. did not want the robbery to take place. Finally, once M.B. freed R.M.W. from Awwad, R.M.W. waited for M.B. and only left the store with him.

We note that R.M.W. argues that he should be tried as a juvenile because he turned himself in, because he was developmentally delayed, because he was in special education for some subjects, and because he was diagnosed with attention deficit hyperactivity disorder. We note that he produced credible witnesses who testified to his quiet, kind, and respectful demeanor. He was by most accounts a gentle boy who would have been thought incapable of such an act as armed robbery; however, the videotape and Awwad's testimony tell a different story.

We also note that contrary to R.M.W.'s assertion in his brief, the circuit court did not find that he was guilty of the charged crimes. Rather, the circuit court concluded that it "did not believe that a gun was put to his head before he went in the store." To decide whether transfer to the juvenile court was appropriate, the circuit court had to decide whether the clear and convincing evidence supported R.M.W.'s story that he was a manipulated or an unwilling participant in the robbery. At the close of evidence in the hearing, the circuit court told R.M.W. that the court would take a break and upon its return he would be asked if "his story really happened or not." That question was asked, and the circuit court could not find his answer, his prior testimony, or his story credible. In this hearing, the circuit judge

sat as the finder of fact. Credibility of witnesses is an issue for the finder of fact. *Polk v. State*, 348 Ark. 446, 73 S.W.3d 609 (2002). On appeal, we have no means to assess witness credibility and may not act as the finder of fact. *Ridling v. State*, 360 Ark. 424, 203 S.W.3d 63 (2005). R.M.W. has not borne his burden of proving that the circuit court was clearly erroneous. We are not left with the definite and firm conviction that a mistake has been committed.

Affirmed.