104 Ark.App. 280

**Uris MAGANA–GALDAMEZ, Appellant,**

v.

**STATE of Arkansas, Appellee.**

**No. CA 08–460.**

Court of Appeals of Arkansas.

Jan. 28, 2009.

---

Walker Law Firm, by Kent Walker, for appellant.

Dustin McDaniel, Att'y Gen., by Valerie Glover Fortner, Ass't Att'y Gen., for appellee.

RITA W. GRUBER, Judge.

By criminal information filed in the Benton County Circuit Court, the State charged Uris Magana–Galdamez with the offenses of being an accomplice to capital murder and being an accomplice to aggravated robbery. The crimes were committed on December 30, 2006, when both Magana–Galdamez and the victim were seventeen years old. Magana–Galdamez's sole point in this interlocutory appeal is that the circuit court's denial of his motion and amended motion to transfer his case to juvenile court, entered by order of February 5, 2008, was clearly erroneous. Finding no clear error, we affirm.

The case was decided under our juvenile-transfer statute. Before being amended, Ark.Code Ann. § 9–27–318(h) (Repl.2002) stated: "Upon a finding by clear and convincing evidence that a juvenile should be tried as an adult, the judge shall enter an order to that effect." The subsection was changed by 2003 Ark. Acts No. 1116 § 10, as reflected in the statutory language that controls the present case:

(h)(1) The court shall make written findings on all of the factors set forth in subsection (g) of this section.

(2) Upon a finding by clear and convincing evidence that a case should be transferred to another division of circuit court, the judge shall enter an order to that effect.

Ark.Code Ann. § 9–27–318 (Supp.2005).

The State asserts that the effect of the changed language is that clear and convincing evidence now pertains to transferring jurisdiction rather than to retaining it. Directing our attention to *Otis v. State*, 355 Ark. 590, 605, 142 S.W.3d 615, 623 (2004), and *Williams v. State*, 96 Ark.App. 160, 162, 239 S.W.3d 44, 46 (2006), the State complains that courts have ignored this distinction. The State's position is well taken.[1]

---

1. Although in *Williams* we misquoted Ark. Code Ann. § 9–27–318(h) (Supp.2005), our holding remains sound: that the circuit court's decision to refuse transfer was not clearly erroneous.

We note that the standard of review for juvenile-transfer cases remains the same after enactment of Act 1116. *See R.M.W. v. State,* 375 Ark. 1, 289 S.W.3d 46 (2008) (citing *Otis, supra,* for its holding that the reviewing court will not reverse the circuit court's decision unless it was clearly erroneous). *R.M.W.* and the present case were decided under identical statutory language, and in each the circuit court denied the appellant's motion to transfer his case to juvenile court. The supreme court's decision in *R.M.W.* included the following discussion of clear and convincing evidence and the movant's burden of proof:

> *To decide whether transfer to the juvenile court was appropriate,* the circuit court had to decide whether the clear and convincing evidence supported R.M.W.'s story that he was a manipulated or an unwilling participant in the robbery.... *R.M.W. has not borne his burden of proving that the circuit court was clearly erroneous.*

375 Ark. 1, 7–8, 289 S.W.3d 46, 51 (emphasis added, citations omitted).[2] Under these standards, we turn to the appeal now before us.

On January 10, 2008, the circuit court conducted a hearing on Magana–Galdamez's motions to transfer. Dr. Robin Ross, a forensic examiner for the State, was accepted as an expert in psychiatry and testified as follows regarding her forensic evaluation of Magana–Galdamez on March 28, 2007. Magana–Galdamez, an El Salvadoran of slight build and stature, was cooperative, sat quietly, made good eye contact, was never tearful, and had normal speech. His thought processes were logical, his answers relevant, and his conduct socially appropriate. He was aware of why he was there, aware of the charges against him, and able to participate fully in his assessment. He did not appear confused and was not observed to have trouble communicating with Ross or the interpreter who was present. Magana–Galdamez disclosed that his birth date was September 12, 1989, rather than one indicated on records Ross had been given. Magana–Galdamez said that, after coming as a pre-teen or teenager to the United States, he lived with his parents in Springdale, Arkansas. He had finished the sixth grade in El Salvador, was placed in the ninth grade in Springdale, and did well in school. He dropped out because of difficulty learning the language and because he wanted to work and make money so that he could move back to his country.

Dr. Ross also considered Magana–Galdamez's social activities, relationships at home, eight-month history of working at a flour mill, and ability to go through the interview without being confused or upset. On the basis of this and other information, Dr. Ross opined that Magana–Galdamez "had adaptive capacities that would not indicate a mental defect."

Magana–Galdamez told Dr. Ross that he began to drink alcohol at approximately age sixteen, rarely drank hard liquor, drank two to three beers at a time, used to drink about twice a month, and was "drunk" on a little glass of tequila the night of the crimes. He said that he had begun to smoke marijuana about a month before his arrest but did not smoke it daily because he did not want his parents to know, and he did not use other drugs.

The forensic evaluation included assessments of cognitive functioning, the criminal justice system, and Magana–Galdamez's understanding of the system. Dr. Ross

---

2. *Cf. Otis,* 355 Ark. at 605, 142 S.W.3d at 623 n. 2 (positing the issue of whether the juvenile or prosecutor had the burden of proof in juvenile-transfer cases under previous statute).

administered the Folstein Mini Mental State Examination, which she described as a screening tool with excellent validity and reliability: scoring twenty-three out of thirty would indicate a need for further assessment on cognitive functioning, but Magana–Galdamez's score of twenty-seven was above average for his age and level of education. He also had a passing score of eighty out of one hundred on the Georgia Court Competency Test, which Ross described as a structured interview to assess a defendant's understanding of the trial process and issues related to his defense. At this point in the examination, Dr. Ross formed the opinion that Magana–Galdamez had no psychiatric diagnosis, mental disease, or mental defect. Additionally, it was Dr. Ross's opinion that Magana–Galdamez had the capacity to appreciate the criminality of his conduct at the time of committing the crimes, the capacity to conform his conduct to the requirements of the law, and the capacity for the culpable mental state that was an element of the offense with which he was charged. Dr. Ross acknowledged that anti-social personality traits were possible because Magana–Galdamez had been doing things that were illegal, but said that nothing else indicated a diagnosis of a personality disorder and that the diagnosis had not been made. Dr. Ross reiterated that there had been no cognitive or clinical reasons to perform an IQ test.

Dr. Ross testified that, after being read the felony information, Magana–Galdamez talked about events on the night of the crimes. Magana–Galdamez recounted being in a duplex with others, finding two girls, and going to a friend's house with them. He said that he had been drinking, drugs were present but he did not use them, and a "guy" came over. Magana–Galdamez said that this person, whom he had seen before but did not know, was the one who "did this case." Magana–Galda-mez said that he knew it was wrong to rob and kill someone: he did not do it, did not know what was going to happen, and did not know he was going to be breaking the law.

Dr. Ross said that he did not perform the Test of Memory Malingering because Magana–Galdamez did not lack memory of what had happened. Ross stated that the Folstein Mini Test would have indicated the presence of mental retardation; in his opinion, no mental retardation existed and Magna–Galdamez did not suffer from mental disease or defect at the time of the examination or the crime. She testified that it was possible for someone to have a low IQ and still understand the criminality of his conduct and be able to conform conduct to the requirements of the law.

Investigator Greg Hines of the Benton County Sheriff's Office testified that the victim, Derrick Jefferson, died from a single gunshot to the head at close range. Detective Alvaro Barrios of the Springdale Police Department testified that he interviewed Magana–Galdamez and his co-defendant, Erickson Dimas–Martinez. Magana–Galdamez did not speak English well but had no trouble communicating with Barrios, a bilingual speaker of Spanish and English. Magana–Galdamez admitted his involvement in the robbery and homicide by being with Dimas–Martinez and two females when Dimas–Martinez shot Jefferson. Magana–Galdamez said that he shouted at the girls to be quiet, wielding a screwdriver in his hand, and drove the car away from the scene after Dimas–Martinez gave him the keys. Dimas–Martinez gave Magana–Galdamez the firearm used in the shooting and asked him to clean it and the bullets still in it: Magana–Galdamez did so, using his shirt to clean the pistol, and cleaning the bullets individually after removing them from the magazine. Magana–Galdamez did not indicate in the inter-

view that he had been forced to participate in the crimes or that he attempted to prevent them or to help Jefferson.

Two eyewitnesses, sisters Candie Drain and Keri McConnell, identified Magana–Galdamez and Dimas–Martinez as the individuals who committed the crimes. McConnell testified that the sisters were at a party when Dimas–Martinez and Magana–Galdamez offered Jefferson a ride after learning that he had money to pay for gas. McConnell testified that Dimas–Martinez and Magana–Galdamez initially discouraged the sisters from coming along but finally agreed. Dimas–Martinez had Jefferson drive the car, instructing him to make several stops until they got to an old house where Dimas–Martinez and Magana–Galdamez got out and talked. Dimas–Martinez, with Magana–Galdamez standing behind him, came to the driver's side and asked Jefferson and the girls if they had cell phones. After determining that no one had a phone that worked, Dimas–Martinez pulled out a gun, pointed it through the window at Derrick's face, and ordered him out of the car. McConnell stated that Magana–Galdamez did not look surprised and did not ask Dimas–Martinez to stop, and that they both told Jefferson to take off his shirt and give them his money, hat, earrings, and jacket. She testified, "Both of them were doing this to him."

McConnell further testified that Magana–Galdamez put a knife to the throat of her sister, who was crying and screaming hysterically, and told her to be quiet unless she wanted to die. He picked up Jefferson's clothes and belongings from the ground, put them in the car, and got into the driver's seat. Dimas–Martinez walked to the front of the car with Jefferson following him, Dimas–Martinez tried to open the passenger door, and Magana–Galdamez reached over to unlock it for

him. Dimas–Martinez turned around, shot Jefferson, and got into the car. Looking neither surprised nor upset, Magana–Galdamez drove back to the duplex where the party had been. He said it was not "that big of a deal" and told the girls to calm down. He told them they were staying with him overnight, and he took them to his parents' home. In his bedroom, the sisters watched him clean the gun and the bullets from the clip. When they noticed blood on his jacket and became afraid, he again said "it was no big deal" and did not seem to be upset or remorseful.

The State's last witness was Drew Shover, a juvenile intake officer for Benton County. Shover testified that he could not think of anything the juvenile system could offer Magana–Galdamez that the adult system could not offer.

Candie Drain testified for the defense that Magana–Galdamez was in the car and had started the engine at the time of the shooting. She admitted on cross-examination that he held a knife to her throat and told her to be quiet, and that she was afraid of him.

Dr. Ronald McInroe, a clinical psychologist, clinical neuropsychologist, and licensed social worker, testified as an expert in psychological testing. His evaluation of Magana–Galdamez through the Comprehensive Test of Non–Verbal Intelligence produced an intelligence quotient of sixty-four, "in the mild range of mental retardation." Dr. McInroe also diagnosed mild mental retardation under DSM–IV criteria. Scott Tanner, the ombudsman coordinator for the public defender commission, testified about corrections options available for youthful offenders and about the facility at Dermott, Arkansas, where individuals under extended juvenile jurisdiction can be provided housing until age twenty-one, before possible transfer to adult facilities.

## Motion to Transfer

A prosecuting attorney has the discretion to charge a juvenile sixteen years of age or older in the juvenile or criminal division of circuit court if the juvenile has allegedly engaged in conduct that, if committed by an adult, would be a felony. Ark.Code Ann. § 9–27–318(c)(1) (Supp. 2005). On the motion of the court or any party, the court in which the criminal charges have been filed shall conduct a hearing to determine whether to transfer the case to another division of circuit court. Ark.Code Ann. § 9–27–318(e).

▮ A circuit court is required by this statute to consider all of the following factors at a transfer hearing:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court;

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

(10) Any other factors deemed relevant by the judge.

Ark.Code Ann. § 9–27–318(g) (Supp.2005). The court must make written findings on all ten enumerated factors in deciding whether or not to transfer the case, Ark. Code Ann. § 9–27–318(g) and (h)(1) (Supp. 2005), but proof need not be introduced against the juvenile on each factor, and the circuit court is not required to give equal weight to each of the statutory factors in arriving at its decision. *E.g., Richardson v. State,* 97 Ark.App. 52, 244 S.W.3d 736 (2006).

"Upon a finding by clear and convincing evidence that a case should be transferred to another division of circuit court, the judge shall enter an order to that effect." Ark.Code Ann. § 9–27–318(h)(2) (Supp. 2005). Clear and convincing evidence is the degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established. *McClure v. State,* 328 Ark. 35, 942 S.W.2d 243 (1997). A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *R.M.W., supra.*

▮ In the present case, the circuit court's written order stated that its decision to deny Magana–Galdamez's transfer motion was based upon the following con-

siderations of the factors enumerated by Ark.Code Ann. § 9–27–318:

(a) That there can be no doubt as to the most serious nature of the offenses charged;

(b) That the offenses were violent in nature and execution;

(c) That the offenses were committed against a person and as such are given greater weight;

(d) That the evidence and testimony presented showed the Defendant was highly culpable in the offenses committed;

(e) That although the Defendant had not been previously adjudicated as a juvenile, by his own admissions he regularly used drugs and alcohol;

(f) That the Defendant's lifestyle was that of an adult and not a juvenile as evidenced by the fact that the Defendant quit school to work full-time, that he was not restricted to curfews or his parents' rules, and that he was treated as an adult by his parents;

(g) That neither the Juvenile Court nor Extended Juvenile Jurisdiction are realistic options for this Defendant given his age and the nature of the offenses charged;

(h) That the Defendant acted with another in the commission of the offenses;

(i) That the opinions of both the State and Defense experts were reviewed.

The circuit court concluded, upon consideration of these factors, that there was "clear and convincing evidence that the circuit court should retain jurisdiction over this matter." [3]

 Magana–Galdamez presents two primary arguments on appeal: that "the State has failed the evidentiary standard of clear and convincing that the juvenile … met the criteria" of Ark.Code Ann. § 9–27–318, and that his admissions in a police interview should not have been used as evidence. We do not address the second argument because it was not raised to the trial court. *See Raymond v. State,* 354 Ark. 157, 162, 118 S.W.3d 567, 571 (2003) (stating that an argument not raised and made below is not preserved and will not be reached on appeal).

As the moving party, Magana–Galdamez had the burden of proving by clear and convincing evidence that the case should be transferred to the juvenile division of circuit court. *See* Ark.Code Ann. § 9–27–318(h)(2) (Supp.2005). Although his testimony differed from that of other witnesses regarding his culpability in the robbery and murder, and there was conflicting testimony from the two experts on whether he suffered from mental retardation, the assessment of credibility and the weight of competing testimony were matters for the circuit court rather than for the reviewing court to decide. Taking the evidence as a whole, the circuit court retained jurisdiction, making written findings on the enumerated factors of section 9–27–318(g) as to why juvenile jurisdiction was inappropriate. We find no clear error in that decision.

Affirmed.

VAUGHT, C.J., and ROBBINS, J., agree.

**3.** Although the circuit court's language does not reflect the current version of § 9–27–318(h), this does not affect our holding that the court's decision was not clearly erroneous.