v.

**STATE of Arkansas, Appellee.**

**No. 11–1163.**

Supreme Court of Arkansas.

May 24, 2012.

Louis L. Loyd, Malvern, for Appellant.

Dustin McDaniel, Atty. Gen., Rachel H. Kemp, Asst. Atty. Gen., for Appellee.

JIM HANNAH, Chief Justice.

Appellant, C.B., appeals an order denying his motion to dismiss and to declare the juvenile-transfer statute, Arkansas Code Annotated section 9–27–318 (Repl. 2009), unconstitutional and an order denying his motion to transfer to juvenile court. In challenging the constitutionality of section 9–27–318, C.B. contends that the statute (1) violates the separation of powers provided in the Arkansas Constitution by "improperly vesting power in the local prosecuting attorney to determine which Court has initial jurisdiction over certain classes of juveniles[,]" and by "allow[ing] the prosecuting attorney to determine the burden of proof and who to place the burden of proof on"; (2) violates the Arkansas Constitution because it allows a prosecutor to set aside the statutory protections afforded juveniles; (3) denies him equal treatment before the law, because juveniles are a special class of citizens afforded special protection under the United States Constitution and the Arkansas Constitution; and (4) violates the Eighth Amendment to the United States Constitution and article 2, section 9 of the Arkansas Constitution by subjecting him to the jeopardy of a life sentence. In challenging the denial of the motion to dismiss, C.B. contends that the circuit court clearly erred in denying his request to transfer the case from circuit court to juvenile court. We affirm the circuit court.

The record reveals the following facts. On January 30, 2010, sixteen-year-old C.B., fifteen-year-old N.D., and eighteen-year-old Brandon Henderson escaped from the Jack Jones Juvenile Justice Center in Pine Bluff. During the escape, C.B. and N.D. attacked Leonard Wall, a security guard, who later died. In addition, C.B. attacked another security guard, Gloria Wilburn, who suffered injuries. After his escape from the juvenile-detention center, C.B. forced his way into the driver's seat of a vehicle occupied by a man and a woman at a gas station, put the vehicle in reverse, ordered the woman out of the vehicle, and then stole the vehicle. C.B., N.D., and Henderson fled the scene; C.B. and N.D. were apprehended in Fort Smith on February 1, 2010, and Henderson was apprehended the next day in Oklahoma.

On March 11, 2010, C.B. was charged in Jefferson County Circuit Court with the felony offenses of capital murder, three counts of aggravated robbery, first-degree escape, theft of property (valued at $2500 or more), second-degree battery, and the misdemeanor offense of theft of property (valued at less than $500). Subsequently, C.B. filed a motion to dismiss and to declare section 9–27–318 unconstitutional and a motion to transfer to juvenile court. After a hearing, the circuit court entered an order denying both motions. C.B. now brings this appeal.

## I. Constitutionality of Arkansas Code Annotated section 9–27–318

C.B. contends that the circuit court erred in denying his motion to declare section 9–27–318 unconstitutional. Section 9–27–318(c)(1) provides that when a case involves a juvenile who is at least sixteen years old when he or she engages in conduct that, if committed by an adult, would be a felony, a prosecuting attorney may charge the juvenile in either the juvenile or criminal division of circuit court. Section 9–27–318(e) provides that, upon the motion of the court or of any party, the judge of the division of the circuit court in which a delinquency petition or criminal charges have been filed shall conduct a hearing to determine whether to transfer the case to another division of circuit court. Section 9–27–318(h)(2) provides that, upon a finding by clear and convincing evidence that a case should be transferred to another division of circuit court, the judge shall enter an order to that effect.

Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *E.g., Jefferson v. State,* 372 Ark. 307, 276 S.W.3d 214 (2008). If it is possible to construe a statute as constitutional, we must do so. *Id.* Because statutes are presumed to be framed in accordance with the Constitution, they should not be held invalid for repugnance thereto unless such conflict is clear and unmistakable. *Id.*

### A. Separation of Powers

C.B. contends that section 9–27–318 violates the separation of powers provided in the Arkansas Constitution by "improperly vesting power in the local prosecuting attorney to determine which Court has initial jurisdiction over certain classes of juveniles[,]" and by "allow[ing] the prosecuting attorney to determine the burden of proof and who to place the burden of proof on." The separation-of-powers provisions of the Arkansas Constitution are found in article 4 and provides:

> The powers of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confided to a separate body of magistracy, to-wit: Those which are legislative, to one, those which are execu-

tive, to another, and those which are judicial, to another.

No person or collection of persons, being of one of these departments, shall exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Ark. Const. art. 4, §§ 1, 2. Additionally, section 3 of amendment 80 provides that "[t]he Supreme Court shall prescribe the rules of pleading, practice and procedure for all courts; provided these rules shall not abridge, enlarge or modify any substantive right and shall preserve the right of trial by jury as declared in this Constitution." Ark. Const. amend. 80, § 3.

■ In analyzing the constitutionality of statutes in accordance with the separation-of-powers doctrine, this court has held that, "so long as a legislative provision dictates procedure, that provision need not directly conflict with our procedural rules to be unconstitutional. This is because rules regarding pleading, practice, and procedure are solely the responsibility of this court." *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, at 7, 308 S.W.3d 135, 141 (citing Ark. Const. amend. 80, § 3). Under our holding in *Johnson*, the only question that need be asked is whether the challenged legislation dictates procedure.[1] If the legislation bypasses our rules of pleading, practice, and procedure by setting up a procedure of its own, then it violates the separation-of-powers doctrine. *Id.*, 308 S.W.3d at 141.

C.B. relies on *Johnson* to support his contention that, in enacting section 9–27–318, the General Assembly violated the separation-of-powers doctrine because it attempted to create a rule of pleading, practice, and procedure, thereby exercis-

ing a power assigned to the judicial department. The *Johnson* case involved two provisions of the Civil Justice Reform Act of 2003, Arkansas Code Annotated sections 16–55–202 and 16–55–212(b). Section 16–55–202 required the fact-finder in certain civil cases to consider or assess the negligence or fault of nonparties. We concluded that section 16–55–202 violated article 4, section 2 and amendment 80, section 3 of the Arkansas Constitution because it attempted to create a rule of procedure, offending the principle of separation of powers and the powers specifically prescribed to this court by the Arkansas Constitution. Section 16–55–212(b) limited the introduction of medical-costs evidence to the amount of medical expenses paid or the amount to be paid by a plaintiff or on a plaintiff's behalf. We held that, because the rules regarding the admissibility of evidence are within this court's province, the medical-costs provision violated the separation-of-powers doctrine under article 4, section 2 and amendment 80, section 3 of the Arkansas Constitution.

■ In contrast to the statutory provisions at issue in *Johnson*, section 9–27–318 does not create a rule of pleading, practice, and procedure. Section 9–27–318, insofar as it vests prosecuting attorneys with the discretion to bring felony charges against sixteen-year-olds in the criminal divisions of circuit courts, is substantive law that is rooted in public policy. The resolution of questions of policy is to be addressed by the General Assembly, which is the policy-making branch of government. *See Cato v. Craighead Cnty. Circuit Court*, 2009 Ark. 334, at 9, 322 S.W.3d 484, 490. To hold that the General Assembly's enactment of section 9–27–318 was an impedi-

---

1. Procedural law is defined as "[t]he rules that prescribe the steps for having a right or duty judicially enforced, as opposed to the law that defines the specific rights or duties

themselves." *Summerville v. Thrower*, 369 Ark. 231, 237, 253 S.W.3d 415, 420 (2007) (citing *Black's Law Dictionary* 1221 (7th ed.1999)).

ment to this court's rule-making authority would be to interfere with the legislature's policy-making authority. This we will not do. We hold that the legislature did not create in section 9–27–318 a rule of "pleading, practice and procedure" in violation of the separation-of-powers doctrine.

### B. Article 2, section 12 of the Arkansas Constitution

■ C.B. next contends that section 9–27–318 violates article 2, section 12 of the Arkansas Constitution because it allows a prosecutor to set aside the statutory protections afforded to juveniles. Article 2, section 12 provides that "[n]o power of suspending or setting aside the law or laws of the State shall ever be exercised, except by the General Assembly." The General Assembly passed section 9–27–318 as Act 273 of 1989, and it has amended the statute several times, most recently with Acts 1166 and 1809 of 2003. If, as C.B. contends, any laws had been set aside or suspended, it would have been the General Assembly that did so, which it had the authority to do under article 2, section 12. We hold that section 9–27–318 does not violate article 2, section 12 of the Arkansas Constitution.

### C. Equal Protection

C.B. contends that section 9–27–318(c) denies him equal protection under the law in violation of the Fourteenth Amendment to the United States Constitution and article 2, section 3 of the Arkansas Constitution. He asserts that "[t]o vest a prosecutor with this unilateral power to decide which court to file the initial charges, without any guidelines, and with this decision place the initial burden upon the juvenile, who is a protected and a special class of citizen, clearly indicates that under section 9–27–318(c) ... the juvenile is not being treated equally from either county to coun-

ty or case by case." According to C.B., equal protection under the law requires that *all* juveniles be charged initially in juvenile court, with the State carrying the burden of proving that cases should be transferred from the juvenile division to the criminal division. We disagree.

■ The equal-protection clause permits classifications that have a rational basis and are reasonably related to a legitimate government purpose. *Otis v. State,* 355 Ark. 590, 142 S.W.3d 615 (2004). On an equal-protection challenge to a statute, it is not our role to discover the actual basis for the legislation. *Id.* We merely consider whether there is any rational basis which demonstrates the possibility of a deliberate nexus with state objectives so that legislation is not the product of arbitrary and capricious government purposes. *Id.* If we determine that any rational basis exists, the statute will withstand constitutional challenge. *Id.*

■ "[T]reatment as a juvenile is not an inherent right but one granted by the state legislature, therefore the legislature may restrict or qualify that right as it sees fit, as long as no arbitrary or discriminatory classification is involved." *Woodard v. Wainwright,* 556 F.2d 781, 785 (5th Cir.1977). Due to the well-documented rise in the violent crime rate among juveniles in recent years, the legislature was prompted to restrict or qualify the right of treatment as a juvenile by making the option of trying juveniles as adults available to the State. *See Otis v. State,* 355 Ark. at 613, 142 S.W.3d at 628; *Beck v. State,* 317 Ark. 154, 160, 876 S.W.2d 561, 564 (1994). The legislature was entitled to place restrictions or qualifications on the rights afforded to juveniles. C.B. has failed to demonstrate that section 9–27–318(c) is arbitrary or irrational. We hold that section 9–27–318(c) does not deny C.B. equal protection of the law.

### D. Cruel and Unusual Punishment

C.B. also argues that section 9–27–318 is unconstitutional because it is cruel and unusual punishment to allow juveniles to be sentenced under adult-sentencing provisions. "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Because there has been no formal adjudication of guilt and C.B. has not been sentenced, he lacks standing to challenge the constitutionality of the sentencing authorized by section 9–27–318. *See id.; Otis*, 355 Ark. at 611, 142 S.W.3d at 627.

### II. *Denial of Transfer Motion*

C.B. asserts that the circuit court erred in denying his motion to transfer his case from the criminal division to the juvenile division of circuit court. C.B. moved to transfer under section 9–27–318(e), arguing that the purposes of the Juvenile Code could be satisfied by conducting the proceedings in the juvenile division.[2]

Section 9–27–318(e) permits any party to move to transfer, and an order on a motion to transfer may be appealed by any party. *E.g., Lofton v. State*, 2009 Ark. 341, 321 S.W.3d 255. In deciding a motion to transfer, the circuit court is to consider and make written findings on all of the factors set forth in section 9–27–318(g). *Id.;* Ark.Code Ann. § 9–27–318(g), (h)(1). Upon a finding by clear and convincing evidence that a case should be transferred to another division of the circuit court, the circuit court shall do so. Ark.Code Ann. § 9–27–318(h)(2). Clear and convincing evidence is that degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established. *E.g., R.M.W. v. State*, 375 Ark. 1, 289 S.W.3d 46 (2008). This court will not reverse the circuit court's decision unless it was clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.*

The first factor to be considered by the circuit court concerns the seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court. *See* Ark.Code Ann. § 9–27–318(g)(1). The circuit court found that C.B. had been charged with capital murder, aggravated robbery, first-degree escape, second-degree battery, felony theft of property, and misdemeanor theft of property. The circuit court noted that capital murder is the most serious offense for which a defendant can be charged. The circuit court also found that the protection of society required prosecution in the criminal division of circuit court because the victim of capital murder was a guard at a juvenile-detention facility. C.B. does not specifically challenge the circuit court's findings on the first factor.

The second factor concerns whether the alleged offense was committed in an ag-

---

2. Specifically, C.B. cites the purposes listed in section 9–27–302(3) (Repl.2009), which is "[t]o protect society more effectively by substituting for retributive punishment, whenever possible, methods of offender rehabilitation and rehabilitative restitution, recognizing that the application of sanctions that are consistent with the seriousness of the offense is appropriate in all cases"; and section 9–27–302(4), which is "[t]o provide means through which the provisions of this subchapter are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced."

gressive, violent, premeditated, or willful manner. *See id.* § 9–27–318(g)(2). At the hearing, a witness to the attacks testified that, during the attack on Wall, he could hear "flesh hitting flesh" and then "metal hitting flesh." He also testified that he heard Guard Wall repeatedly saying "stop" and "grieving for his life."

Guard Wilburn testified that she and Wall were conducting bed checks when she realized she had not heard from Wall in several minutes, so she went looking for him. She said that she walked up to one of the pods, where she saw C.B. in the doorway telling her to come over there. She said that she looked down and saw Wall lying on the floor with blood everywhere. Wilburn testified that when she opened the door, C.B. rushed her and starting attacking her. She stated that he put her in a chokehold and beat her on her head and kicked her. Wilburn said that she sustained injuries from the beating, including knots on her head and bruises on her neck, stomach, and legs.

Gayla Tackett testified that she encountered C.B. at a gas station, where he forced his way into the driver's seat of the vehicle in which she was sitting. Tackett said that C.B. put the vehicle in reverse, ordered her out of the vehicle, and then stole the vehicle.

The circuit court found that the testimony at the transfer hearing showed that C.B. and a co-defendant ambushed and severely beat the victim, rendering him unconscious and ultimately dead. The circuit court also noted that testimony showed that C.B. was involved in the planning of the attack and continued to beat Wall as he begged for his life. The circuit court specifically found that the offense was committed in an aggressive, violent, premeditated, and willful manner and, therefore, the case should remain in the criminal division of circuit court. C.B.

does not specifically challenge the circuit court's findings on the second factor.

The third factor is whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted. *See id.* § 9–27–318(g)(3). Testimony at the hearing revealed that the offenses were committed against persons and that death and personal injury resulted. The circuit court found that, in this case, C.B.'s actions led to the death of a juvenile-detention guard. The circuit court also found that a second juvenile-detention guard was beaten by C.B., but that she survived her injuries. The circuit court further found that the aggravated robbery at the gas station was committed against two innocent victims. Finding that greater weight is given to these offenses because they were committed against persons, the circuit court then found that the case should remain in the criminal division of circuit court. C.B. does not specifically challenge the circuit court's findings on the third factor.

The fourth factor concerns the culpability of the juvenile, including the level of planning and participation in the alleged offense. *See id.* § 9–27–318(g)(4). Steve McFatridge, who conducted an investigation of the escape with the Jefferson County Sheriff's Department, testified that C.B. was able to leave his cell because a playing card had been folded up and placed in his cell door to prevent it from locking. Albert Kittrell, M.D., the medical director at New Beginnings Behavioral Health in Little Rock and a contract psychiatrist at the Arkansas Department of Correction, conducted an evaluation of C.B. and testified that he had diagnosed C.B. with a mood disorder, not otherwise specified, that is similar to bipolar disorder; attention deficit hyperactivity disorder ("ADHD"); and borderline intellectual

functioning. Dr. Kittrell stated that it was his opinion that C.B. was easily influenced by others. C.B. contends that this evidence shows that he lacked the culpability to plan the escape.

The circuit court found that C.B. had placed the card in the locking mechanism of his cell door to prevent it from locking and that, when Wall was doing a bed check of the cell block, C.B. was able to open his cell door and ambush Wall from behind and beat him to death. The circuit court further found that C.B. was culpable in all of the charged offenses and intimately involved in the planning and execution of the crimes.

The fifth factor concerns the history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other history of antisocial behavior or patterns of physical violence. *See id.* § 9–27–318(g)(5). C.B. contends that this factor weighs in his favor because he had not previously been committed to the Division of Youth Services ("DYS").

Nevertheless, testimony at the hearing revealed that C.B. had a juvenile-offender history, which the circuit court recognized in its findings. The circuit court found that, in 2008, C.B. had been adjudicated delinquent for residential burglary and theft and was admitted to the Lord's Ranch residential-treatment facility. The circuit court further found that, after he was adjudicated delinquent, C.B. was sentenced to twelve months' probation, and that while on probation, C.B. was charged with aggravated assault and committed to DYS on January 12, 2010, and housed in the Jack Jones Jefferson County Juvenile Detention Center to await bed space at a DYS facility. In addition, the circuit court found that, while C.B. was housed at the detention center, he committed the offenses he is charged with in this case.

The sixth factor concerns the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult. *See id.* § 9–27–318(g)(6). Donna Davis, C.B.'s mother, testified at the hearing about C.B.'s behavioral and social problems, and the circuit court acknowledged her testimony in its findings. The circuit court noted Davis's testimony that she felt that C.B. was immature and unable to adjust to most situations, that C.B. began receiving treatment for ADHD when he was three and one-half years old, that C.B. was diagnosed with bipolar disorder when he was ten years old, that he was "in and out of treatment facilities," and that he was sent to Millcreek and Rivendale for his behavioral problems.

The circuit court also acknowledged Davis's testimony about C.B.'s home life. The circuit court noted that Davis was divorced from C.B.'s father when C.B. was three and one-half years old, that Davis and C.B. moved four times during his childhood, and that Davis home schooled C.B. "most of the time" because he did not perform or adapt well in school. The circuit court also noted that, while Davis blamed most of C.B.'s problems on a nonspecific speech and hearing problem, no medical or school records were introduced to verify these problems.

The circuit court found that, even though Davis testified to a number of behavioral problems, C.B. was properly charged in the criminal division of circuit court. C.B. does not specifically challenge the circuit court's findings on the sixth factor.

The seventh factor concerns whether there are facilities or programs available to the judge of the juvenile division of

circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday. *See id.* § 9–27–318(g)(7). C.B. asserts that his case should have been transferred to the juvenile division because Dr. Kittrell's testimony indicated that there were a number of rehabilitative services available through DYS. But Dr. Kittrell also testified that he was not aware of any specific program through DYS that might help C.B., and he could not say with certainty that C.B. would likely be rehabilitated through any juvenile program, much less before the expiration of his twenty-first birthday.

Testimony at the hearing revealed that C.B. had been through a number of juvenile programs. The circuit court stated that it believed that, because C.B. had been in the juvenile system, including probation and a DYS commitment, there were no facilities or programs available to the judge of the juvenile division of circuit court that were likely to rehabilitate C.B. before the expiration of his twenty-first birthday. The circuit court found that there was no testimony given regarding what, if any, program C.B. could benefit from given the serious charges he was facing in this case. The circuit court further found that C.B. would not be rehabilitated before the expiration of his twenty-first birthday; therefore, C.B.'s case should remain in the criminal division of circuit court.

The eighth factor concerns whether the juvenile acted alone or was part of a group in the commission of the alleged offense. *See id.* § 9–27–318(g)(8). C.B. contends that this factor weighs in his favor because the offense was committed with two co-defendants, "one being ... eighteen-year-old Brandon Henderson, who from the testimony and evidence offered by the Appellant clearly indicates that he was taken advantage of due to his immaturity and emotional instability." The circuit court noted that C.B. was part of a group that committed the crimes but emphasized that C.B. "started this entire episode by ambushing and beating ... the juvenile detention guard."

The ninth factor concerns written reports and other materials relating to the juvenile's mental, physical, educational, and social history. *See id.* § 9–27–318(g)(9). C.B. claims that Dr. Kittrell "clearly established the mental and emotional state and this was supported by the testimony of Appellant's mother, Donna Davis." In its order, the circuit court acknowledged that Dr. Kittrell testified on behalf of C.B., diagnosed C.B. with a mood disorder and borderline intellectual functioning, stated that there was a "possibility" of rehabilitating C.B. in a juvenile setting, and did not feel that the Department of Correction was a good place for a juvenile.

Finally, the tenth factor to be considered by the circuit court concerns any other factors deemed relevant by the judge. *See id.* § 9–27–318(g)(10). Marvin Roberts, a guard who supervised C.B. at the W.C. Brassell Detention Center, an adult facility, testified that, on one occasion, C.B. pushed him into his cell, began beating him with his fists, and tried to gouge his eye out. Guard Bradley Strange, who also supervised C.B. at the Brassell facility, testified that, on another occasion, C.B. punched him in the face, tried to gouge his eye out, and punched his testicles repeatedly.

The circuit court found that, while in a juvenile facility, C.B. beat a guard to death, and that, after he was charged with capital murder, C.B., on two separate occasions, attacked and physically injured two guards in an adult facility, resulting in two additional charges as an adult. The circuit court further found that C.B.'s behavior,

both in the juvenile and adult setting, showed that he was an extremely violent and impulsive person. C.B. does not specifically challenge the circuit court's findings on the tenth factor.

This court has held that a juvenile may be tried as an adult solely because of the serious and violent nature of the offense. *E.g., Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998). In this case, C.B. stands accused of capital murder, a crime of a serious and violent nature. Proof need not be introduced against the juvenile on each statutory factor, and the circuit court is not required to give equal weight to each statutory factor. *E.g., Otis, supra.* As required, the circuit court considered and made written findings on each factor set forth in section 9–27–318(g). Based on the evidence presented at the hearing, we cannot say that the circuit court clearly erred in denying C.B.'s motion to transfer. We hold that there is clear and convincing evidence to support the circuit court's ruling.

Affirmed.