The State concedes error on this point, agreeing that the supreme court has held that AMI Crim.2d 9202 does not accurately reflect the law. *Jones v. State,* 357 Ark. 545, 558, 182 |₁₀S.W.3d 485, 492 (2004).[6] The sentencing procedures for habitual offenders set forth in section 5–4–501, however, only apply to sentencing for felony offenses. Because we have modified Andrews's felony convictions to misdemeanor convictions, we therefore sentence him to one year in the county jail. *See* Ark.Code Ann. § 5–4–402(b) (Repl.2006); *Young v. State,* 2009 Ark. App. 101, at 2, 2009 WL 398159.

Affirmed as modified.

VAUGHT, C.J., and GLOVER, J., agree.

2012 Ark. App. 591

**M.R.W., Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 12–164.**

Court of Appeals of Arkansas.

Oct. 24, 2012.

---

William R. Simpson, Public Defender, by: Margaret Egan, Deputy Public Defender, for appellant.

Dustin McDaniel, Att'y Gen., by: Ashley Argo Priest, Ass't Att'y Gen., for appellee.

DAVID M. GLOVER, Judge.

M.R.W. appeals the circuit court's denial of her motion to transfer her case to juvenile court, arguing that the denial was clearly erroneous. We affirm.

M.R.W. was charged in July 2011 with one count of first-degree murder and eleven counts of terroristic act for events that occurred in May 2011–shots were fired at Kelough Doss and Jason Ford; Ford died from his injuries, and Doss suffered two gunshot wounds. M.R.W.'s alleged role in the crime was to set up Doss and Ford to be robbed by arranging to meet them and then directing them into the situation where both young men were robbed and shot. M.R.W.'s date of birth is June 12, 1994; at the time of the incident, she was almost seventeen years old. A transfer hearing was held October 31, 2011, at which time the trial court denied the transfer. A written order setting forth the reasons for denying the transfer was filed on November 10, 2011. M.R.W. timely filed a notice of appeal on December 2, 2011.

In *Cole v. State*, 2012 Ark. App. 281, at 1–2, 2012 WL 1415975, our court set forth the standard of review for juvenile-transfer cases:

A prosecuting attorney has the discretion to charge a juvenile, sixteen years of age or older, in the juvenile or criminal division of circuit court if the juvenile has allegedly engaged in conduct that, if committed by an adult, would be a felony. Ark.Code Ann. § 9–27–318(c)(1) (Repl.2009). On the motion of the court or any party, the court in which the criminal charges have been filed shall conduct a hearing to determine whether to transfer the case to another division of circuit court having jurisdiction. Ark.Code Ann. § 9–27–318(e). The court shall order the case

transferred to another division of circuit court only upon a finding by clear and convincing evidence that the case should be transferred. Ark.Code Ann. § 9–27–318(h)(2). Clear and convincing evidence is the degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established. *Neal v. State,* 2010 Ark. App. 744, at 6 [379] S.W.3d [634], [at 637]. We will not reverse a trial court's determination of whether to transfer a case unless that decision is clearly erroneous. *Id.* at 6 [379] S.W.3d at [637]. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. *Id.* [379] S.W.3d at [637].

Pursuant to Arkansas Code Annotated section 9–27–318(g) (Repl.2009), the trial court shall consider all of the following factors in a transfer hearing:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court;

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against person or property, and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

(10) Any other factors deemed relevant by the judge.

The trial court is required to make written findings on all of the above factors. Ark.Code Ann. § 9–27–318(h)(1). However, there is no requirement that proof be introduced against the juvenile on each factor, and the trial court is not obligated to give equal weight to each of these factors in determining whether a case should be transferred. *D.D.R. v. State,* 2012 Ark. App. 329, at 3, 420 S.W.3d 494, 496. The defendant, as the moving party, bears the burden of proving by clear and convincing evidence that his or her case should be transferred to the juvenile division of circuit court. *Magana–Galdamez v. State,* 104 Ark.App. 280, 291 S.W.3d 203 (2009).

Three witnesses testified on behalf of M.R.W. Scott Tanner, coordinator for the juvenile ombudsmen division of the Public Defender Commission, testified regarding his familiarity with the services available through the juvenile division of circuit court and the Division of Youth Services (DYS). Tanner stated that if M.R.W. were committed to DYS, there would be two programs available to her, with the

primary goal of both being to complete high school or obtain a GED, and that individual and group mental-health services and other therapies were also available. He said that both DYS facilities were equipped to handle a defendant who was already eighteen, and that for extended-juvenile-jurisdiction (EJJ) cases, they could maintain youth until their twenty-first birthdays. Tanner testified that it was his understanding that if the case were transferred and designated as EJJ, the juvenile court would retain jurisdiction until the defendant's twenty-first birthday and then maintain the defendant on probation and aftercare, and the defendant would still be subject to an adult conviction and an adult sentence. On cross-examination, Tanner admitted that over the last several years, a number of individuals who had been committed to DYS and had been deemed to have been rehabilitated had later committed serious, violent offenses.

M.R.W.'s older half-sister, British Love, next testified that M.R.W.'s father had been killed when she was young; that M.R.W. had never known him; and that she and M.R.W. lived together when they were little until DHS became involved and split them up, leaving M.R.W. in DHS custody alone. According to Love, their mother would get drunk and not wake up to get her seven children to school, and that when she was drinking, she was mean and abusive.

Love testified that M.R.W. asked her to take M.R.W. to the detective in charge of the present case and that M.R.W. knew the police were looking for her because they left messages on her cell phone. Stating that she knew how serious the charges were against M.R.W., Love offered that M.R.W. was not capable of harming anyone. Love acknowledged that M.R.W. had a history of violence and stated her belief that M.R.W. had mental-

health issues for which she had previously been treated. She also agreed that M.R.W. had not been respectful to school authority figures but considered M.R.W. mature for her age, although at times she acted out without thinking of the consequences.

It was Love's testimony that she had no trouble with M.R.W. when M.R.W. lived with her at age fourteen or fifteen. Love admitted that M.R.W. missed a juvenile hearing while she was living with her but blamed that on their mother, who had called and told M.R.W. that she did not have to appear and then called several days later to tell M.R.W. that there was a warrant out for her arrest for failure to appear. Love also testified that M.R.W. had a one-year-old child; that M.R.W. had become pregnant while living with their mother; and that although Love had tried to get custody of M.R.W. from their mother, it had "never worked out." Love admitted that M.R.W. used to associate with a gang called the Trap Girls and that M.R.W. had a Trap Girl tattoo on her lower stomach, but she said that she did not know what the Trap Girls were.

Jacqueline Collier, M.R.W.'s aunt, testified that her sister (M.R.W.'s mother) had a drinking problem. She faulted her sister for M.R.W.'s problems, stating that M.R.W. had no guidance, was in foster care from an early age, and had not been provided even the basic necessities by her mother. She also blamed her sister for dissuading M.R.W. from appearing in juvenile court. Collier denied seeing any violent tendencies in M.R.W. and said that she did not consider M.R.W. to be mature, even though M.R.W. acted like she wanted to be mature.

The State first called Sherry Smith, a probation officer for the Pulaski County Juvenile Court, who began working with M.R.W. in 2008. Smith testified that

M.R.W. had been adjudicated delinquent for third-degree battery and disorderly conduct and had a pending case for obstructing government operations. When Smith began working with M.R.W., Smith said, M.R.W. was on conditions of release; while she had been testing negatively on her drug screens, she had violated her curfew, had failed to appear in court, and was truant. Smith testified that M.R.W. had a psychological evaluation in November 2008; that it was the doctor's opinion that she did not need medication because she could choose to control her behavior; and that it was the doctor's recommendation that M.R.W. be placed in a youth-services center. However, according to Smith, by the time the report was authored, M.R.W. was already in an alternative school. Smith reported that M.R.W. had been suspended from school four times in 2008 and once in 2009 for various threats and violations of school rules; had numerous write-ups; had grades ranging from A to F; and had poor school attendance. Smith did not know if there were any services that could rehabilitate M.R.W.

Tommy Hudson, a homicide detective with the Little Rock Police Department, testified that officers responding to a shooting on May 20, 2011, at the Hangar Hill apartment complex found Jason Ford suffering from multiple gunshot wounds, including a fatal gunshot wound to the head. He confirmed that Kelough Doss was located at a nearby gas station with two gunshot wounds to the right upper side of his body. Doss told the detectives that he and Ford were at the apartment complex to meet two girls and that when they arrived, M.R.W. (also known to Doss as Selena Trap Girl) directed them to the bottom of the apartment complex, where they were robbed and shot. Based on calls and text messages found on Doss's phone to M.R.W.'s cell phone, she was developed as a suspect.

Detective Hudson said that M.R.W. gave a statement to the police acknowledging that she was known as Selena Trap Girl; that she had an on-and-off relationship with Doss; that she and another girl were meeting Doss to look at an apartment; and that she was communicating with Doss on her cell phone the night of the shooting. Although she first told police that she lost her cell phone, a family member later brought it to the police station. Though M.R.W. initially denied being involved with one of the shooters or having anything to do with the shootings, after her cell phone was given to the police, she admitted her involvement with the alleged shooter and her part in arranging for Doss to come to the apartment complex, telling officers that she knew that the shooter was bringing a gun to the robbery and that she was to receive half the money obtained in the robbery.

The circuit court denied M.R.W.'s request to transfer her case to juvenile court based on the following specific findings of fact in accordance with Arkansas Code Annotated section 9–27–318(g):

1. The offenses charged, first-degree murder, and eleven counts of terroristic acts are very serious offenses, and protection of society requires prosecution in the criminal division of circuit court.

2. The testimony presented indicates that the offenses were committed in an aggressive, violent, pre-meditated and willful manner.

3. The offenses charged are violent offenses committed against persons and property, resulting in personal injury and death.

4. According to the testimony presented, the defendant was not the only participant in the offenses, but appeared to

be involved in the planning and commission of the offenses.

5. The defendant has a minimal prior history of being adjudicated a juvenile delinquent involving misdemeanors. The defendant has exhibited a history of non-compliance with the orders and services offered by the Juvenile Division of the Circuit Court.

6. The defendant is not mature, but has demonstrated a desire to be treated as an adult.

7. There are facilities available to the judge of the juvenile division for a person of the defendant's age, but the Court finds they are not likely to rehabilitate the defendant by her twenty-first birthday.

8. The testimony presented at the transfer hearing indicates that the defendant acted as a part of a group in the commission of the alleged offenses.

9. All exhibits admitted into evidence have been considered by the Court in reaching its decision on the motion to transfer to Juvenile Court.

10. The defendant has suffered from a difficult childhood and the Court finds there is some gang involvement of the defendant.

On appeal, M.R.W. argues that the trial court's denial to transfer her case to juvenile court is clearly erroneous. She argues that the trial court failed to consider that a commitment to DYS was a "yet untried avenue" for her and that she might benefit from DYS services such as strict supervision, counseling, and education in a secure facility. We disagree. As apparent from Sherry Smith's testimony, M.R.W. has failed to take advantage of any opportunity offered to her to date, and the trial court was not obliged to believe that she would take advantage of the opportunities afforded her if her case were transferred to juvenile division. The trial court found that M.R.W. was charged with serious offenses that were committed in a violent, pre-meditated manner, resulting in one death and serious injuries to another person; that M.R.W. appeared to be involved in the planning of the offenses, which were committed by a group; and that M.R.W. was involved in gang activity. M.R.W. does not challenge any of these findings on appeal. The trial court's decision to deny M.R.W.'s request to transfer her case to juvenile court was not clearly erroneous and therefore is affirmed.

M.R.W. also simultaneously argues that all of her charges are EJJ-designated offenses that would allow her more time for rehabilitation. However, a circuit court must first determine that a case should be transferred to juvenile court before an order to transfer as an EJJ case may be entered; because the circuit court in the instant case determined that M.R.W.'s case should remain in circuit court, any EJJ argument is not applicable in this situation. *J.S. v. State,* 2009 Ark. App. 710, 372 S.W.3d 370 (citing *Lofton v. State,* 2009 Ark. 341, 321 S.W.3d 255).

Affirmed.

GLADWIN and GRUBER, JJ., agree.