DAVID M. GLOVER, Judge
In January 2016, appellant Dionte Parks was charged in the Sebastian County Circuit Court with one count of murder in the first degree, two counts of aggravated robbery, and one count of kidnapping, all Class Y felonies. In March 2016, Parks filed a motion to transfer his case to the juvenile division. After a hearing on the motion, the circuit court denied the request to transfer. Parks appeals this denial, arguing it was clearly erroneous. We affirm.
The following extensive evidence was adduced at the hearing. On January 23, 2016, two masked men entered Kaleb Watson's home while Watson and Bailey Smith were inside. The men bound Watson with a shoestring and began to gather items, including Watson's cell phone and wallet. Watson escaped his bindings and attacked one of the men, who shot him several times. The two men then fled the scene. Watson died as a result of his injuries.
On January 24, the Fort Smith Police Department received an anonymous tip that someone wanted to come forward with possible information on the case. Parks and his mother, LaRhonda Marable, came to the police station later that afternoon. During an interview, Parks told Detective Anthony Parkinson that brothers Shakur and James Sharp stopped by his house on January 23, showed him a gun they had stolen earlier that day, and told him they wanted to "hit a lick." Parks said the Sharps asked for a bag, which Parks provided to them, and some rope or string. Parks gave them a shoelace from one of his shoes. Parks later saw the Sharps outside and went to talk to them; they told him they were going to rob Kaleb Watson, and they wanted him to knock on the front door, run off, and then go in the back door with them. Parks said he did not want to do it, but Shakur pulled out the gun; although Shakur never threatened Parks, Parks decided to go along with the plan. However, after knocking on the front door, instead of going to Watson's back door, Parks ran home. Parks stated he heard about eight gunshots and then saw both Sharp brothers running from Watson's house. Parks also stated that prior to entering Watson's house, James had taken a compound bow out of Watson's truck and had given it to Parks, who took it to his house and hid it in a closet. Pursuant to a warrant, Detective Parkinson recovered the stolen bow and the pair of running shoes from which Parks had removed the shoelace he had given to the Sharp brothers.
Detective Parkinson also obtained a statement from Shakur Sharp during transport back to Fort Smith from Little Rock (where he had fled after Watson was shot). Shakur confessed he had gone into Watson's home; he said Parks was supposed to knock on the front door and then come to the back door and go inside, but Parks did not do that, so James went inside with him; and James tied Watson up *183 with the shoelace provided by Parks. According to Shakur, Watson removed his restraint and rushed Shakur; Shakur stated the gun went off and kept going off. Shakur said James ran out the back door and he followed him; the only items he took were Watson's wallet and cell phone. Shakur asserted it was Parks who told him there were guns, money, and maybe marijuana in Watson's house, and it would be a "good place to hit a lick."
After arriving in Fort Smith, Shakur gave a second statement. He stated Parks was the one who told them about Watson's house-that there were thousands of dollars, guns, some weed, and a .380 handgun in the house-and it had been Parks who took the bow out of Watson's truck and took it back to his house and hid it. Shakur then provided the details of the robbery and shooting for a second time.
Detective Parkinson and Detective Williams picked Parks up from school on January 28, 2016, on a probation violation and a theft-of-property warrant. Parks agreed to speak with Detective Parkinson again about the Watson case. Parks stated that on January 23, Darrion Carter told him he wanted to "hit a lick," and Parks told Carter about Watson's home. The Sharp brothers then came to his house wanting to "hit a lick" and asking what was inside Watson's house; Parks told them about a PlayStation 3, guns, money, and bows and arrows. After the interview, Detective Parkinson arrested Parks on first-degree murder, kidnapping, aggravated robbery, and his outstanding warrants. Detective Parkinson acknowledged that Parks came in and gave statements that provided him with some leads in the investigation.
Detective Troy Williams testified he obtained a statement from James Sharp while transporting him from Little Rock back to Fort Smith. James told him he had stolen a gun from a car earlier in the day on January 23. He claimed Parks messaged Darrion about hitting a lick; Darrion declined, but the Sharp brothers went to Parks's house to discuss it. James reiterated that Parks had taken the bow out of Watson's truck and had taken it to his house. The remainder of his statement matched Shakur's statement about what happened inside Watson's house.
Scott Tanner, the Juvenile Ombudsman, testified there were several lock-down facilities available for juveniles, but the rooms were not locked at night, although the capacity existed if necessary. Tanner explained there was no guarantee Parks would be placed in a particular facility; the Department of Youth Services (DYS) would determine where to place him. Tanner admitted there were five or six escapes each year, but the juveniles were usually caught within hours; in his opinion, DYS was the most serious delinquency disposition a juvenile court could order, although none of the programs were wholly successful. Factors Tanner believed were necessary for rehabilitation to be successful included inmate intelligence and the capacity to understand and respond to cognitive behavior therapy ; family and community support; and the ability to acknowledge wrongdoing.
Kevin Moore, Parks's probation officer, testified Parks was receptive to issues on which he advised him, although Parks would stand up for himself when he felt he needed to do so. He believed Parks's father, although a convicted felon, was a good example for Parks and wanted to teach Parks to be a good man.
Several people testified about Parks's educational struggles, his need for mental-health services due to unresolved behavioral and emotional problems, and his medication. While Parks had difficulty in school, there was testimony he was receptive *184 to help and was a good-natured student. However, Parks had several behavioral issues at school. Parks was moved from school to school, depending on where the special-education classes were located.
Dr. Curtis Grundy, a licensed psychologist, performed a psychological evaluation on Parks and conducted an intellectual assessment. Parks's scores were in the lowest parts of the scale. It was Dr. Grundy's opinion that despite his learning deficiencies, Parks was capable of turning his life around, and he concluded Parks was amenable to intervention. Dr. Grundy stated Parks had intellectual limitations, as well as limited academic and educational functioning; he had negative structure in his life; he was in a single-parent home where his mother worked long hours, allowing for decreased supervision; and he had delved into more delinquent behaviors as he had aged. However, Dr. Grundy believed Parks could benefit from DYS resources, as he needed a structured environment to manage his needs and to provide him treatment services. While he believed Parks would need extended juvenile jurisdiction, Dr. Grundy believed successful treatment could occur before Parks's twenty-first birthday, although he admitted he could not guarantee that result.
LaRhonda Marable, Parks's mother, testified that when she learned Parks was involved in Watson's death, she took him to the police station because Watson was someone's child, and she would want someone to come forward if that had been one of her children. Marable said Parks loves horses, is a good rider, and trains horses, but he is a follower and had been bullied at school. She was aware Parks had been to Watson's house on several occasions and played video games, and Watson had given them a puppy. She stated Watson and Parks had smoked weed together, but Watson had apologized for that when she confronted him.
Arkansas Code Annotated section 9-27-318(g) (Repl. 2015) provides the factors to be considered in a motion to transfer a case from the criminal division to the juvenile division of circuit court. The circuit court shall make written findings on all the factors set forth in subsection (g) of this section. Ark. Code Ann. § 9-27-318(h)(1). However, the State is not required to introduce proof of each factor, and the circuit court does not have to give equal weight to each factor. Flowers v. State , 2017 Ark. App. 468, 528 S.W.3d 851. The movant bears the burden of proving the necessity of transfer from the criminal division to the juvenile division of circuit court. Id. On appeal, the appellate court will not reverse a circuit court's decision denying a motion to transfer unless it is clearly erroneous; a finding is clearly erroneous when, after reviewing the evidence, the appellate court is left with a firm and definite conviction that a mistake was made. Id. The appellate courts will not reweigh the evidence presented to the circuit court. Id.
In the present case, the circuit court made findings regarding each factor listed in section 9-27-318(g). The factors, and the circuit court's findings on each factor, are as follows:
(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court. The circuit court noted Parks was charged with four Class Y felonies, the most serious classification of offenses other than capital murder. The circuit court specifically found the offenses "could hardly be more serious" and "[d]ue to the seriousness of the offenses and this defendant's level of participation in them, the Court *185 is of the opinion the issue of societal protection weighs in favor of the State."
(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner. The circuit court found the offenses were committed in an aggressive, premeditated, and willful manner.
(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted. The circuit court found the offenses were committed against not one, but two people, and resulted in the death of Kaleb Watson.
(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense. The circuit court was of the opinion Parks had "significant" culpability in the commission of the offenses, specifically noting Parks not only was present at the planning of the robbery and kidnapping, which ultimately resulted in a homicide, but "it is fair to say the homicide would not have occurred but for his involvement." The circuit court found Parks "provided the target and the motivation for the robbery by advising the other defendants of valuables within the victim's residence"; provided a bag to be used in the robbery and the shoelace used to restrain Watson; and actively participated in the plan he helped concoct by creating a diversion at Watson's front door to allow the Sharps to enter the residence through the back door.
(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence. The circuit court noted Parks had been adjudicated a juvenile offender on five occasions, although none were offenses against persons or felonies. Nevertheless, evidence of antisocial and violent behavior at school was presented, including shoving other students, fighting, and making threats against his peers at school.
(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult. The circuit court found Parks was neither sophisticated nor mature, and he suffered from low intellectual functioning.
(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday. While there were facilities and programs available, the circuit court found there was insufficient evidence from which it could determine the likelihood of rehabilitation. Concerns set forth by the circuit court were the lack of reliable statistics regarding recidivism, the uncertainty of housing options, recurring escapes from the facilities, and the fact that Parks's prior involvement with other juvenile resources, although not the same facilities or programs, had failed to rehabilitate him in the past. The circuit court was concerned Parks's limited intelligence would be a hindrance to successful rehabilitation in a juvenile facility.
(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense. It was undisputed Parks and the Sharp brothers acted as a group during the commission of the offenses.
*186 (9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history. The circuit court noted Parks had "significant challenges" in his educational history; however, the records did not indicate those challenges impaired his ability to comport himself according to law.
(10) Any other factors deemed relevant by the judge. The circuit court noted Parks's age at the time of the offenses; he was three days away from turning sixteen. It also considered that Parks's early cooperation with the police played a "vital role" in solving the crimes. However, in contrast, the circuit court found it was noteworthy Parks betrayed Watson, who had befriended and welcomed Parks into his home, and Parks repaid such overtures of friendship with actions that, at the very least, Parks knew would lead to terror and loss of property.
Parks addresses each factor separately, but his arguments can be grouped together. As for factors one, two, three, and four, while conceding the offenses are serious felonies, Parks argues he was the least culpable of the three defendants because he was not the person who employed violence against Watson, he did not want to commit the crime, and he ran back to his house after knocking on Watson's front door. This argument is not persuasive. A juvenile may be tried as an adult solely because of the serious and violent nature of the offense. C.B. v. State , 2012 Ark. 220, 406 S.W.3d 796. Furthermore, it is of no moment Parks did not personally employ the gun used during the crimes; his association with the use of weapons in the course of the crimes satisfies the fact the crimes were committed in a violent manner. Neal v. State , 2010 Ark. App. 744, 379 S.W.3d 634.
As for factors five and six, Parks argues he has not shown a propensity for serious physical violence, testimony indicated he functioned at a low intellectual level and was in special-education classes, his mother worked long hours and he was left by himself for extended periods of time, and he was described as a follower. The circuit court noted that while Parks had been previously adjudicated a juvenile offender, had been placed on probation, and had violated his probation, he had not committed any felonies or crimes against persons. However, the circuit court noted there had been several incidents at school involving antisocial behavior, violence, and threats to other students.
With regard to factor seven, Parks contends there are several juvenile lock-down facilities and programs available, and Dr. Curtis Grundy had testified he could benefit from such resources. However, Dr. Grundy admitted successful treatment was difficult to predict. While the circuit court noted facilities and programs were available in which Parks could be placed, it was concerned about the likelihood of rehabilitation for Parks; factoring into this determination were the lack of reliable statistics regarding recidivism, the uncertainty of housing options, recurring escapes from the facilities, and the fact that Parks's prior involvement with other juvenile resources had failed to rehabilitate him in the past. The circuit court was further concerned that Parks's limited intelligence would be a hindrance to successful rehabilitation in a juvenile facility, given Scott Tanner's testimony that inmate intelligence and the capacity to understand and respond to cognitive behavior therapy were significant factors in successful juvenile rehabilitation.
Although the offenses were committed by a group, which is the eighth factor, Parks points to the testimony he was more *187 a follower than a leader and contends his low intellectual functioning made it difficult for him to understand the implications of his involvement. As for the ninth factor, written reports and other materials relating to Parks's mental, physical, educational, and social history, Parks points to Dr. Grundy's psychological evaluation, as well as his school records, juvenile-court records, and psychological-testing results. While the circuit court was cognizant of Parks's "significant challenges" in his educational history, it found the records did not indicate such challenges impaired his ability to comport himself according to law.
As for the tenth factor, the circuit court noted Parks's early cooperation with law enforcement in helping to solve the crime; however, it was bothered by the fact that while
Watson had shown Parks kindness, those acts of kindness had been repaid by Parks with actions that ultimately caused Watson's death.
We cannot hold that the circuit court's decision to deny Parks's motion to transfer his case to juvenile court was clearly erroneous. A juvenile may be tried as an adult solely because of the serious and violent nature of the offense. C.B. , supra. Parks is charged with four Class Y felonies. The circuit court found that Parks played an integral and active role in the planning and commission of the offenses, that he had provided items to be used in the home invasion, and that the homicide would not have occurred but for his involvement in naming Watson as a potential robbery target. The circuit court was particularly bothered by Parks's betrayal of Watson's kindness toward him by setting Watson up to be a robbery target and, ultimately, a murder victim. While some factors weighed in favor of Parks's motion to transfer to juvenile court, the circuit court is not required to give equal weight to each factor. As required, the circuit court considered each factor and made findings on each factor, and its decision to deny Parks's motion to transfer is not clearly erroneous.
Affirmed.
Gruber, C.J., and Harrison, J., agree.