ROBERT J. GLADWIN, Judge
Appellant James Larail Sharp, Jr., appeals the Sebastian County Circuit Court's April 11, 2017 denial of his motion to transfer to the juvenile division of circuit court and for an extended juvenile jurisdiction (EJJ) designation. He argues that the decision should be reversed because the trial court clearly erred in finding that his case should not be transferred. We affirm.
I. Facts
Appellant was charged in the Sebastian County Circuit Court with one count of murder in the first degree, a Class Y felony; two counts of aggravated robbery, a Class Y felony; and one count of kidnapping, a Class Y felony. The charges arose from an event that occurred on January 23, 2016, and the victim was identified as Kaleb Glenn Watson.
*848 Bailey Smith testified that on January 23, 2016, she was with Watson at his apartment watching television when someone knocked at the front door. Watson got up to answer the door, but no one was there. As Watson shut the front door, two masked men wearing all black came through the back door. The men ordered Watson to sit down on the couch beside Smith. Smith stated that one of the men had a gun in his hand and the other had a tote bag. The man with the gun demanded that Smith and Watson give him all their money and everything else they had and then grabbed Watson's phone and wallet from the coffee table and put them in his pocket. He then pointed the gun at Watson and instructed the man with the tote bag to "tie him up," referring to Watson. The man with the tote bag tied up Watson with a shoelace and put Watson's shotguns in the bag.
The man with the gun then turned his back on Smith and Watson, and Watson was able to free himself and jump on the man with the gun. The man with the gun fired four shots into Watson's chest. Smith stated that the individual who was holding the bag dropped it and ran out the back door. The shooter also ran out the back door. Watson later died from his injuries. Photographs of Watson's body were introduced, reflecting that he had sustained bullet wounds to the upper left chest, upper right thigh, and left earlobe. Shell casings from a 9mm firearm were found at the scene. Smith identified the perpetrators as black males that looked to be fifteen or sixteen years old.
On January 24, 2016, the Fort Smith Police Department received an anonymous tip that someone wanted to provide information regarding Watson's death. Dionte Parks and his mother, LaRhonda Marable, arrived at the police station that afternoon. Parks told Detective Anthony Parkinson that appellant and his brother, Shakur, had stopped by Parks's house on January 23, 2016, showed him a gun they had stolen earlier that day, and told him they wanted to "hit a lick." Parks stated that appellant and Shakur asked for a bag and some rope or string. Parks gave them a bag and a shoelace from one of his shoes. Parks later saw appellant and his brother, who told him they were going to rob Watson and that they wanted Parks to knock on the front door, run off, and then go in the back door with them. Parks explained that he did not want to do it, but Shakur pulled out a gun.
Parks went along with the plan; however, after knocking on the front door, instead of going to Watson's back door, Parks ran away from the apartment. Parks stated that he heard approximately eight gunshots and then saw both appellant and Shakur running from Watson's apartment. Parks also stated that before entering, appellant had taken a compound bow out of Watson's truck and had given it to Parks, who took it to his house and hid it in a closet. Parkinson recovered the stolen bow and the pair of running shoes from which Parks had removed the shoelace that he had given to appellant and Shakur.
Parks also explained to Parkinson that he had contact with appellant on Facebook Messenger after the incident. In the messages, Parks told appellant that Watson was dead. Appellant told Parks not to snitch and described how they had disposed of the gun and that no one had seen their faces. Parks also told Parkinson that, during their discussions before the robbery, Shakur said that if Watson resisted, he would shoot him in the leg.
Appellant and Shakur were found and arrested in Little Rock on January 27, 2016. Parkinson obtained a statement from Shakur during transport to Fort Smith. Shakur confessed that he had gone into *849 Watson's residence. He stated that Parks was supposed to knock on the front door and then go to the back door and go inside, but Parks did not do that, so appellant went inside with him. Shakur said that appellant tied Watson up with the shoelace, but that Watson freed himself from the restraint and rushed Shakur, at which time the gun went off and kept going off. Shakur stated that appellant ran out the back door and that he followed him. Shakur claimed that it was Parks who told him there were guns, money, and maybe marijuana in Watson's house and that it would be a "good place to hit a lick."
Detective Troy Williams obtained a statement from appellant while transporting him from Little Rock to Fort Smith. During the ride, Williams read appellant his Miranda rights and proceeded to question him; appellant confessed to participating in the crime along with Shakur and Parks. Appellant told Williams that he had stolen a 9mm gun from a car earlier on January 23. He said that he took it back to a friend's apartment, where the friend and Shakur test fired it. He claimed that Parks messaged another friend about "hitting a lick," but when he declined, appellant and Shakur went to Parks's house to discuss it. Appellant said that Parks had taken a bow out of Watson's truck and had taken it to his house. The remainder of appellant's statement corroborated Shakur's statement about what had happened inside Watson's house. Upon arrival at the police department, appellant again was read his Miranda rights and questioned a second time by detectives, and he again described the events of January 23, 2016.
On April 22, 2016, appellant filed a motion to transfer to the juvenile division of the circuit court and for an EJJ designation. Appellant's motion was based largely on the fact that, at the time the crimes occurred, he was fifteen-years and seven-months of age and that he is an unsophisticated, immature juvenile.
A four-day hearing on appellant's motion was held on February 27, February 28, March 1, and March 29, 2017, during which nineteen witnesses testified. On April 11, 2017, the circuit court issued a four-page order denying appellant's motion,[1] making the following factual findings on each of the ten factors enumerated in Arkansas Code Annotated section 9-27-318(g) (Repl. 2015):
(1) The seriousness of the alleged offense and whether the protection of society requires prosecution in the criminal division of circuit court. The circuit court noted that appellant was charged with four Class Y felonies, the most serious classification of offenses other than capital murder. It specifically found that the offenses "could hardly be more serious" and "[d]ue to the seriousness of the offenses and this defendant's level of participation in them, the Court is of the opinion the issue of societal protection weighs in favor of the State."
(2) Whether the offense was committed in an aggressive, violent, premeditated, or willful manner. The circuit court found the offenses were committed in an aggressive, premeditated, and willful manner. It noted that "[w]hile it is true that Shakur Sharp directed the actions of the defendant during the events, it must also be noted that the defendant *850 participated willingly in the planning and commission of violent offenses knowing a gun would be involved, witnesses would be restrained and according to the other codefendant, that Shakur was ready to shoot a victim who resisted. The fact the defendant was nervous, scared and incompetent does not belie the nature in which the offenses were committed. As to premeditation, the evidence was clear there was a plan formulated and that the defendant was at the very least present during that planning." The circuit court also noted that, with respect to that plan, appellant stole the murder weapon from another victim and that "[b]ut for that, the death of Kaleb Watson would likely not have occurred."
(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted. The circuit court found that the offenses were committed against not one, but two persons, and personal injury in the form of the death of Watson resulted.
(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense. The circuit court found that appellant's culpability was "significant," noting that "[h]e not only was present at the planning of the robbery and kidnapping, which led to the homicide, he actively participated in offenses he knew were being committed with a gun he had himself stolen." His actions in restraining the victim, albeit clumsy and ineffective, were telling as well.
(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns or physical violence. The circuit court found that appellant had been adjudicated a juvenile offender on four occasions, although none were offenses against persons or felonies. It noted, however, that appellant was on probation at the time of the commission of these offenses and that there was "evidence of other antisocial and violent behavior on the part of the defendant, including assaulting another student at school, having sex with a seventh-grade student in a school bathroom, threatening a teacher on two occasions, and being at school under the influence of marijuana."
(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult. The circuit court found that, "in contrast to his brother, [appellant] was primarily raised in a loving home by a woman described as 'terrific,' 'excellent,' and 'the best' when witnesses testified as to her parenting of the defendant. There was also testimony about the outstanding influence of his aunts. While it is true there was not an admirable father figure in his life, appellant enjoyed a home that was loving, exposed him to good influences, and practiced discipline and encouragement to live well."
(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court that are likely to rehabilitate the juvenile before the expiration of the juvenile's twenty-first birthday. The circuit court found that there were facilities and programs available, but there was insufficient evidence from which it could determine the likelihood of rehabilitation. Specific concerns set out by the circuit court were the lack of reliable statistics regarding recidivism, the uncertainty of housing *851 options, recurring escapes from the facilities, and the fact that appellant's prior involvement with other juvenile resources, although not the same facilities or programs, had failed to rehabilitate him in the past.
(8) Whether the juvenile acted alone or was part of a group in the commission of the offense. The circuit court found that it was undisputed that appellant acted in a group of three with his brother, Shakur Sharp, and Dionte Parks during the commission of the offenses.
(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history. The circuit court examined the records produced at the hearing and found that appellant had "significant challenges" regarding his mental, physical, educational, and social history.
(10) Any other factors deemed relevant by the judge. The circuit court noted that it also considered appellant's good behavior in the Juvenile Detention Center since his arrest, "the fact that he might have benefited in the past from more effective treatment which was not forthcoming [,]" and his age at the time of the offenses as well as his current age.
Appellant filed a timely notice of appeal on May 9, 2017, pursuant to Arkansas Code Annotated section 9-27-318(i).
II. Procedural Issue
In his brief, appellant characterizes his motion below as a request to transfer to juvenile court for an EJJ designation. He did not obtain a ruling below on any request for an EJJ designation. For that reason, any argument with respect to an EJJ designation is not preserved for review. See Lewis v. State , 2014 Ark. App. 136, 432 S.W.3d 145. Moreover, to challenge an EJJ designation an appellant's case must have first been transferred to the juvenile division. Although a party may request an EJJ designation and the EJJ designation hearing and transfer hearing may be conducted at the same time, there can be no EJJ designation unless the case is either already in the juvenile division of circuit court or is transferred to the juvenile division. See Ark. Code Ann. § 9-27-318(e), (i), and (m) ; Ark. Code Ann. § 9-27-503(e) (Repl. 2015); see also J.S. v. State , 2009 Ark. App. 710, 372 S.W.3d 370. Because the circuit court found that appellant's case should not be transferred to the juvenile division, any claim by appellant challenging the lack of an EJJ designation is meritless. See Lofton v. State , 2009 Ark. 341, 321 S.W.3d 255.
III. Applicable Law and Standard of Review
The substantive and procedural requirements for the transfer of a case to the juvenile division of circuit court or for an EJJ are set forth in sections 9-27-318 and 9-27-503, respectively. The movant bears the burden of proving the necessity of transfer from the criminal to the juvenile division of circuit court. Nichols v. State , 2015 Ark. App. 397, 466 S.W.3d 431. Upon a finding by clear and convincing evidence that a case should be transferred, the circuit court shall do so. Id. at 3-4, 466 S.W.3d at 432. See Ark. Code Ann. § 9-27-318(h)(2). Clear and convincing evidence is the degree of proof that establishes a firm conviction in the fact-finder as to the allegation sought to be established. Nichols, supra. The denial of a motion to transfer will not be reversed on appeal unless it is clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that a mistake has been committed. Id.
*852 Arkansas Code Annotated section 9-27-318(g) sets forth all the factors the circuit court shall consider in a transfer hearing to be considered in a motion to transfer a case from the criminal division to the juvenile division of circuit court. Section 9-27-318(h)(1) requires the circuit court to make written findings on all the above factors, but there is no requirement that proof be introduced against the juvenile on each factor or that the circuit court give equal weight to each of these factors in determining whether a case should be transferred. Nichols, supra. This court will not reweigh the evidence presented to the circuit court. Flowers v. State , 2017 Ark. App. 468, 528 S.W.3d 851.
IV. Discussion
As required by section 9-27-318(h)(1), the circuit court made written findings on each of the factors set forth in subsection (g). Appellant maintains, however, that the circuit court erroneously determined that the relevant factors weighed in favor of prosecuting appellant in the criminal division of circuit court. Appellant challenges the circuit court's findings regarding factors four through ten, arguing that his culpability was diminished because he was a "follower," he is immature and unsophisticated, his prior offenses and incidents were not violent, and there are juvenile services available to him. He also contends that the circuit court did not take into consideration his mental or psychological factors or that, because he was not taken into Arkansas Department of Human Services (ADHS) custody, shortly before the crimes he was released to his birth mother and into the home of codefendant and brother, Shakur. He does not challenge the findings that the offenses "could hardly be more serious" and that they were committed against a person in an aggressive, premeditated, and willful manner that resulted in the death of Watson.
As to factor four, appellant argues that the circuit court misapplied section 9-27-318(g)(4), the culpability of the juvenile and his participation in the alleged offenses. He claims that the circuit court did not consider Smith's testimony that the perpetrators looked like fifteen-and sixteen-year-old individuals, that she could tell they were young, that this was new to them, and this was not something they previously had done. She said she could see that they were nervous. Further, Smith's testimony was that Shakur directed appellant what to do at all times-brandishing the gun and yelling at appellant to look in the closet. Smith testified that as soon as Watson jumped on Shakur, appellant dropped the bag containing Watson's shotguns and ran out the back door.
Appellant maintains that the circuit court's finding that his culpability is significant is clearly erroneous. The testimony by the witnesses with knowledge of the incident was that appellant was reluctant, nervous, and scared. The witnesses confirmed that appellant was following the commands of his older brother, Shakur, that he did a poor job of following the directions to restrain Watson, and that he fled as soon as Watson freed himself and jumped on Shakur. Appellant claims the circuit court's assessment was inconsistent with the evidence submitted; accordingly, its finding is clearly erroneous. This argument is not persuasive. As we reiterated in our opinion affirming the denial of the motion to transfer appellant's codefendant Parks, see Parks, supra , a juvenile may be tried as an adult solely because of the serious and violent nature of the offense. Moreover, it is of no moment that appellant did not personally employ the gun used during the crimes; his association with the use of weapons in the course of *853 the crimes satisfies the fact that the crimes were committed in a violent manner. Id. ; see also Neal v. State , 2010 Ark. App. 744, 379 S.W.3d 634.
Regarding factors five and six, appellant acknowledges that the circuit court noted in its written findings that appellant had been adjudicated four times as a juvenile offender, but he noted that none of the offenses were against persons and none were felonies. The circuit court noted as antisocial or violent behavior that appellant's school records from 2012 to 2016 indicated that he had been suspended from school several times for various offenses, including punching another student in the face at the bus stop, having sex with a female student in the girls' restroom, threatening a teacher on multiple occasions, and being under the influence of marijuana at school.
Because of behavioral issues, appellant attended an alternative-education school. The dean of students testified that appellant's disciplinary issues at school were not significantly different from any other students at Belle Point and that appellant was always respectful to her. Further, his probation officer, Kevin Moore, told the circuit court that there was nothing about appellant's previous offenses that were particularly egregious or threatening in any way. He testified that appellant responded well at the Civilian Student Training Program (CSTP), graduated, and had earned some awards. Moore told the circuit court that he did not view appellant's involvement with the juvenile system as a progression, that his behavior was typical to other juveniles, and that he did not view appellant's behavior as progression to more crimes. He said that he did not observe violence with appellant and that his delinquency up to this point was not serious.
Moore testified that appellant was put on supervision for "criminal mischief," but there was nothing in his file to indicate that the offense for which he was on probation was "particularly egregious or scary or threatening or aggravated." Moore testified that he felt that appellant is an intelligent young man but that he liked to do things "his way." He stated that during probation, appellant had problems being obedient at home and at school and had been suspended from school several times. He also observed appellant acting disrespectfully to his stepmother, and he filed a petition to revoke appellant's probation at one point due to appellant's behavior at home and at school.
Appellant's obedience problems prompted Moore to recommend that appellant go through the CSTP. Moore testified that appellant "did fine" in the CSTP but that he got in trouble again with the court less than a month after he returned from the program. He agreed that appellant had received services from the juvenile court, participated in programs and counseling, but had continued to get into trouble.
Moreover, appellant claims that in its findings, the circuit court did not reflect consideration of his maturity, emotional attitude, pattern of living, or desire to be treated as an adult; rather, the circuit court commented on the testimony that appellant was raised by a loving guardian and lacked an admirable father figure. A review of the relevant testimony to this factor, however, reveals that appellant's therapist, Emily Stevenson, testified that his poor impulse control probably kept him from behaving socially like he should otherwise. She also reported to the court that in late November 2015, about a month and half before the shooting, appellant reported to her feelings of hopelessness, lack of concentration, a change in appetite or sleeping, and suicidal ideation or threats of *854 suicide or self-harm. She diagnosed him with major depressive disorder.
Robert Wilkerson testified that appellant was immature, that appellant lived in a fantasy world, and that he was a "clown" and disruptive to his church class. Tammy Austin, appellant and Shakur's "Aunty," told the circuit court that appellant was a follower and that he needed Shakur's approval. Kathryn Miller, counselor at appellant's school, testified that on the Friday before the shooting as she sat with appellant waiting for the child-abuse report to be resolved so that the school could determine where appellant would go when school let out, appellant told her that he would rather be in jail or foster care than go home to Charles Gordon.
Several family members and a family friend from church testified about appellant's home life. Appellant had lived with his stepmother, Freda Gordon, since he was only a few months old. The testimony consistently indicated that she was an outstanding mother-described as "awesome," a "terrific mother," "excellent," and "the best" mom. Testimony described Freda as a very steady influence on appellant's life and that she gave him everything she could. In contrast, Charles Gordon, appellant's father, was mostly out of the picture, unsupportive, and not a positive role model. Appellant was described as a good kid but immature and a "follower."
Appellant claims that the circuit court failed to adequately consider these two factors in its written findings. He submits that there is no indication that the circuit court properly weighed the evidence presented regarding this factor and that its failure to do so is clearly erroneous. We disagree and note that the circuit court detailed antisocial or violent behavior that indicated appellant had been suspended from school several times for various offenses and had been required to attend an alternative-education school.
Regarding factor seven, the circuit court heard evidence that there are facilities or programs available to the judge of the juvenile court. At the time of the hearing, four years remained before appellant would reach the age of twenty-one. Moore testified that the juvenile system had not exhausted all its resources available to appellant. Moore testified that appellant had completed the CSTP program "with flying colors," which, according to Moore, was significant. Moore also told the circuit court, however, that appellant lacked a strong male role model in his life and that he lacked a mentor completely.
Scott Tanner, the coordinator of the Juvenile Ombudsman Division through the Arkansas Public Defender Commission, testified that recent studies of adolescents reveal that there is a lack of development of the frontal lobe of a child's brain until they reach their early to midtwenties. He detailed research that helped establish the foundation for U.S. Supreme Court decisions stating that adolescent brains continue to develop until age twenty-five, making youth more malleable to instruction and to change and to be able to modify their behavior much more so than adults.
Tanner told the circuit court that within our state a concerted effort is being made to increase training to acknowledge the impact of early childhood trauma on behaviors and adolescents. He stated that if appellant were transferred to the juvenile system, he would be eligible to receive services including substance-abuse counseling, mental-health treatment, vocational training, and a basic education.
Tanner testified as to the circuit courts release authority over appellant until he turns twenty-one, and that up to the age of twenty-one, the circuit court would have *855 the ability to revisit any adult disposition under section 9-27-330. He explained the review, services, facilities, and release protocol within the system. Tanner also testified that there were no specific programs designed to address violent crimes; just generic programs designed to address substance abuse, anger issues, and vocational training. He testified that currently there were only three juveniles at the Division of Youth Services for homicide offenses. In his opinion, factors necessary for rehabilitation to be successful included inmate intelligence and the capacity to understand and respond to cognitive-behavior therapy ; family and community support; and the ability to acknowledge wrongdoing.
Appellant argues that the evidence established that services for him had not been exhausted and that the circuit court erred in this respect. We disagree and note that although the circuit court found that there were facilities and programs available, it held that there was insufficient evidence from which it could determine the likelihood of rehabilitation. Specific concerns set out by the circuit court were the lack of reliable statistics regarding recidivism, the uncertainty of housing options, recurring escapes from the facilities, and the fact that appellant's prior involvement with other juvenile resources, although not the same facilities or programs, had failed to rehabilitate him in the past.
Regarding factor eight, it is undisputed that the offense was committed by three juveniles, of which appellant was the youngest. Despite testimony from several witnesses that appellant was directed to take action and was influenced by his older brother, Shakur, appellant was present during the planning and commission of the offense.
With respect to factor nine, the circuit court reviewed volumes of materials including appellant's mental-health records dating back to 2009; his school records detailing poverty, poor vision and dental care, instability in housing and unmet basic needs; the FINS records detailing the lack of a guardian as a six-year-old child; his educational records; his medical records that indicate a smaller than average build and a diagnosis of AD/HD; his mental-health records detailing a mental-health diagnosis since he was eight years old; and a need for medication and intensive treatment that he did not receive due to factors completely beyond his control as a fifteen-year-old child. The circuit court noted that "the records produced at the hearing of this matter demonstrate that the defendant has significant challenges as it relates to these factors, some attributable to the actions of the defendant himself and others due to his limited intellectual prowess."
A therapist and school-based physician with Perspectives Behavioral Health recounted appellant's history of in-school counseling for behavioral and mental-health issues between ages eight and fifteen years. They both testified that appellant had impaired functioning at home and at school because of behavioral and mental-health disorders, including AD/HD, oppositional defiant disorder, and depressive disorder. According to the Perspectives physician, appellant had been referred to a day-treatment program, but due to issues with Medicaid and transportation, he never began that service.
A school counselor at the alternative-education school testified appellant spoke to her about an incident that occurred with his father a couple of days before Watson's death. Appellant reported that he had gotten into an argument with his father and that his father had choked him. The counselor testified that she called an ADHS investigator to look into the incident because she was concerned about appellant's safety and was worried he would either *856 run away or retaliate against his father. She stated that someone with the Arkansas State Police came and talked to appellant. She testified that appellant's birth mother ended up picking him up from school that day.
Appellant claims that the circuit court completely omitted any reference to appellant's significant level of mental distress and impairment and the fact that his therapist had recommended residential treatment less than three weeks before the shooting. He argues that the circuit court failed to mention that appellant was frequently prevented from seeking services, and ultimately, from being admitted for treatment by circumstances completely out of his control, namely his Medicaid status and lack of transportation.
Appellant argues that there is no indication by the circuit court that it considered the impact of his recent physical abuse-specifically choking-by his putative father. He maintains that the circuit court wholly failed to consider the effect of his mental and psychological condition in relation to the decision to transfer. We disagree and hold that the circuit court did consider this issue and noted that appellant had faced significant challenges. There is no requirement that the circuit court give this factor more weight than any other.
Finally, as to factor number ten, appellant argues that the circuit court erred by not considering as a relevant factor that appellant had been choked by his putative father two days before this incident, and that because neither ADHS nor the Arkansas State Police took appellant into custody and care on Friday, the school released appellant to his birth mother, Malika McFadden, and into the home of his codefendant brother, Shakur. Appellant submits that the failure of the circuit court to identify this as relevant in the context of a fifteen-year-old's request for transfer is erroneous.
Citing Miller v. Alabama ; Jackson v. Hobbs , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), appellant notes that the United States Supreme Court discussed the differences between children and adults in the context of sentencing: " Roper[2] and Graham[3] establish that children are constitutionally different from adults for purposes of sentencing." Because juveniles have diminished culpability and greater prospects for reform, we explained, "they are less deserving of the most severe punishments." Graham , 560 U.S. at 68, 130 S.Ct. 2011. He submits that those cases relied on three significant gaps between juveniles and adults. First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Roper , 543 U.S. at 569, 125 S.Ct. 1183. Second, children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. Id. And third, a child's character is not as "well formed" as an adult's his traits are "less fixed," and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." Id. at 570, 125 S.Ct. 1183.
Appellant urges that the circuit court failed to consider all the evidence on these factors as required by the statute, and although it was free to use its discretion in the weight afforded to each factor, he claims that the circuit court's decision *857 should be reversed because it failed to give appropriate weight to seven of the ten factors as required by section 9-27-318(g).
As previously stated, a juvenile may be tried as an adult solely because of the serious and violent nature of the offense. Lofton, supra. The fact that appellant followed his brother's orders in tying up Watson does not diminish his level of culpability or responsibility for the events. The circuit court noted that appellant stole a gun for the group to use to "hit a lick" and thus played an integral and active role in the planning and commission of the crimes.
The circuit court, moreover, was presented with evidence that, despite being raised by a supportive stepmother, and despite his years-long participation in school-based counseling as well as other programs, including CSTP, appellant continued to get into trouble. While his prior criminal history may not be violent, it is extensive, and all interventions so far have proved unsuccessful in rehabilitating appellant.
Despite appellant's arguments, we hold that the circuit court did consider appellant's mental-health issues and found that he had "significant challenges" in that respect. The circuit court also found that appellant may have benefited from services that were not forthcoming. While those factors weighed in favor of appellant's juvenile-transfer motion, the circuit court was not required to give equal weight to each factor. Nichols, supra. As previously stated above, the serious and violent nature of the charges alone is sufficient to uphold the circuit court's denial of the juvenile-transfer motion, without regard to the evidence of other factors. Carroll v. State , 326 Ark. 882, 934 S.W.2d 523 (1996) (holding the serious and violent nature of a capital-murder charge, even if the minor is an accomplice, is sufficient to uphold the denial of a motion to transfer to juvenile court). The circuit court considered the evidence presented on the ten factors as required by the relevant statutes, and it was free to use its discretion in the weight afforded to each factor. The evidence presented at the juvenile-transfer hearing supports trying appellant as an adult; accordingly, the circuit court's decision to deny appellant's juvenile-transfer motion was not clearly erroneous.
Affirmed.
Gruber, C.J., and Abramson, J., agree.

Appellant is alleged to have committed the offenses with two codefendants, his brother, Shakur, and Parks. Each codefendant filed a separate motion to transfer, and a combined hearing was held on the motions. The circuit court entered separate orders and findings for each codefendant. This court affirmed the denial of codefendant Parks's motion to transfer on January 31, 2018. See Parks v. State , 2018 Ark. App. 63, 542 S.W.3d 181.

Roper v. Simmons , 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).